## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SYNTAX-BRILLIAN CORPORATION, | ) | Case No. 08-11407 (BLS) |
| et al., | ) | |
| | ) | Jointly Administered |
| Reorganized Debtors. | ) | |
| | ) | |
| | ) | |
| SB LIQUIDATION TRUST, | ) | Adv. No. 10-51389 |
| | ) | |
| Plaintiff, | ) | Related to Adv. Docket Nos. 15, 16, |
| v. | ) | 21, and 23 |
| | ) | |
| PREFERRED BANK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

David M. Fournier
Evelyn J. Meltzer
Pepper Hamilton LLP
Hercules Plaza
1313 Market Street, Suite 5100
Wilmington, DE 19899

Allan B. Diamond
Andrea L. Kim
Eric D. Madden
Michael J. Yoder
Diamond McCarthy LLP
909 Fannin Street, Suite 1500
Houston, TX 77010

*Counsel and Special Counsel,
respectively, for Plaintiff SB
Liquidation Trust*

Stuart M. Brown
R. Craig Martin
Edwards Angell Palmer & Dodge LLP
919 N. Market Street, 15th Floor
Wilmington, DE 19801

Thomas M. Robins III
Kenneth Russak
Frandzel Robins Bloom & Csato, L.C.
6500 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048

*Counsel for Defendant Preferred Bank*

### OPINION[1]

Before the Court is a motion (the "Motion") [Adv. Docket No. 15] filed by Preferred Bank (the "Bank" or "Defendant") to dismiss the complaint (the "Complaint") [Adv. Docket No. 1] filed by the SB Liquidation Trust (the "Trust" or "Plaintiff"). The Trust was established pursuant to the plan of liquidation (the "Plan") [Docket No. 1016] filed by Syntax-Brillian Corporation and its affiliated debtors (collectively, "SBC" or the "Debtors") and confirmed by the Court [Docket No. 1529]. Upon the effective date of the Plan, all estate assets and causes of action were transferred to and vested in the Trust. The Trust initiated this adversary proceeding against the Bank to recover damages allegedly owed to the Debtors' estates. By the Complaint, the Trust has alleged that the Bank aided and abetted certain officers and directors of the Debtors in breaching their fiduciary duties and in committing fraud. The Trust also seeks to avoid certain allegedly fraudulent transfers received by the Bank. By the Motion, the Bank has moved to dismiss the Complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7012, on the ground that the Trust has failed to state a claim upon which relief may be granted. For the following reasons, the Court will grant the Motion.

### I. BACKGROUND

On July 8, 2008 (the "Petition Date"), the Debtors filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Prior to the Petition Date, SBC was a public company engaged in the business of manufacturing and distributing high-definition televisions ("HD TVs"), utilizing a liquid crystal display technology, under the "Olevia" brand

---

[1]    "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P. 7052(a)(3). Accordingly, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, the Court herein makes no findings of fact or conclusions of law.

name.  SBC was the result of a 2005 merger (the "Merger") between Brillian Corporation ("Brillian") and Syntax Groups Corporation ("Syntax").  SBC employed a "virtual manufacturing model" whereby it outsourced components and product assembly to Asian suppliers and manufacturers.  SBC's production model allowed SBC to shift the upfront costs of materials and labor to its suppliers and manufacturers because SBC did not pay for completed HD TVs until they were delivered.

A.    **Relationship between Syntax and Kolin**

In early 2004, before the Merger, Syntax entered into a manufacturing agreement (the "Manufacturing Agreement") with Taiwan Kolin Company, Ltd. ("Kolin").  At least two of the officers and directors (the "Insiders")[2] of Syntax served as officers, directors, and/or shareholders of Kolin.  In connection with the Manufacturing Agreement, Syntax and Kolin entered into a technology research and development allowance agreement, a volume incentive agreement, and a channel price protection agreement (collectively, the "Price Protection Rebates").[3] Additionally, Syntax, Kolin, CIT Commercial Services, Inc. ("CIT"), and Hsin Chu International Bank ("HIB") entered into a four-party factoring agreement in July 2004 under which Syntax assigned the collection of all of its existing and future accounts receivable to CIT.  The proceeds collected by CIT, in turn, were assigned to HIB on behalf of Kolin.

---

[2]    Along with these two officers and directors, the Trust groups the following five officers and directors of Syntax together and terms them the Kolin Faction: James Li, Thomas Chow, Christopher Liu, Roger Kao, and Alice Phang.  The Court refers to the Kolin Faction as the "Insiders."

[3]    For the years ending June 2005 and June 2004, Kolin provided Price Protection Rebates of approximately $27.9 million and $1.26 million, respectively.

**B.**    **Relationship between Syntax and the Bank**

To facilitate the Manufacturing Agreement, Syntax entered into a $3.75 million credit agreement (the "Loan Agreement") with the Bank in November 2004.  Pursuant to the Loan Agreement, the Bank provided letters of credit and trust receipt loans to finance Syntax's acquisition of imported inventory from Kolin.  The Bank required Syntax and Kolin to enter into an agreement pursuant to which the outstanding payables totaling $5 million owed to Kolin in connection with the Manufacturing Agreement would be subordinated to the Bank's note evidencing the Loan Agreement.  Accordingly, under the terms of the Loan Agreement, the Bank was repaid with the proceeds that CIT collected from Syntax's domestic accounts receivable.

The Bank and Syntax modified the terms of the Loan Agreement several times.  In December 2004, the parties increased the principal amount of the loan to $10 million with a $5 million sub-limit for trust receipt advances.  In March 2005, the parties again increased the principal amount to $12 million with a $7 million sub-limit for trust receipt advances and an extended maturity date.  In June 2005, the parties further increased the principal amount to $17.5 million with a $15 million sub-limit for trust receipt advances.

In September 2005, the Loan Agreement was modified again, whereby the principal amount was increased to $20 million and the maturity date was extended.  Under the 2005 modification, the sub-limit for working capital advances was increased to $10 million and the sub-limit for trust receipt advances was reduced to $5 million.  Additionally, the subordination agreement with Kolin was abolished, and the Bank agreed to instead receive a standby letter of credit issued by HIB for $10 million.  Factored proceeds were transferred from CIT to the Bank's control account under the following terms: (1) 25% of cash proceeds collected by CIT would pay down existing trust receipt advances on a first in, first out basis; (2) 60% of such cash

proceeds would pay down Syntax's working capital line with the Bank, and upon Syntax's

request, Syntax's accounts payable to Kolin for the same amount; and (3) the balance of such

cash proceeds would go to Syntax's operating account to cover operating expenses.

**C.     Post-Merger Credit**

After the Merger, the Loan Agreement was again modified in December 2005 to increase

the total commitment of the facility to $22 million and the sub-limit for trust receipt notes to $7

million.  In January 2006, Syntax executed another amendment to the Loan Agreement that

extended the maturity date of the loan and increased the total commitment for the facility to $28

million and the sub-limit for trust receipt notes to $9 million. In October 2006, the Bank again

extended the maturity date of the loan, increased the maximum credit amount to $33 million, and

increased the sub-limits for refinancing and trust receipt notes to $19 million.

In December 2006, Syntax and the Bank again modified the Loan Agreement.  SBC

became a party to the financing arrangement with the Bank and the trust receipt financing was

eliminated.  Through February 2007, the maximum credit amount under the Loan Agreement

was to be $55 million and the sub-limit for working capital advances was to be $50 million.

After that, the maximum credit amount was to be reduced to $22 million and the sub-limit for

working capital advances was to be reduced to $20 million.

**D.     Backdating and the Kolin Line**

Beginning in December 2005, the Bank advanced additional funds to SBC (the "Kolin

Line") that were immediately transferred to an account maintained by Kolin at the Bank.  The

initial advance of $3.8 million was secured by a checking account held by Kolin at the Bank.

This loan, evidently intended to be temporary, was extended several times.  In the process of

extending the maturity date and amount of this loan, there were several instances of backdating.

The first instance of backdating occurred in connection with the initial advance was dated December 23, 2005 with a maturity date of February 6, 2006. This advance was not signed until January 31, 2006 and was backdated to December 20, 2005. The second instance occurred when the initial advance was extended to January 5, 2007. This extension was associated with a package of loan documents dated April 24, 2006 that may have been backdated.[4] The third instance of backdating occurred on January 10, 2008 when an extension agreement to the Kolin Line was dated December 21, 2007.

E.    **Relationships between Bank Personnel and the Insiders**

There were several incidents involving Phanglin Lin, an employee of the Bank, that Plaintiff has suggested demonstrate that the Bank was trying to cultivate the favor of two of the Insiders, Thomas Chow and James Li. The first involved a cash advance to Mr. Chow of $300,000 on November 16, 2007, without any loan advance form. The second was an invitation to Mr. Chow and Mr. Li to attend a VIP party at the Beverly Hills Four Seasons Hotel in early December. The third was a wine cooler purchased from Neiman Marcus that was gifted to Mr. Li.

F.    **SBC's Business Dealings with SCHOT and OFE**

Beginning in June 2006, Kolin issued approximately $200 million in invoices relating to sales to two of the main distributors of Debtors' HD TVs across China, South China House of Technology, Ltd. ("SCHOT") and Olevia Far East ("OFE"). These invoices led to the recognition on SBC's books of over $300 million in accounts receivable and sales from SCHOT/OFE. In 2007, SBC's sales to SCHOT/OFE grew exponentially because of anticipated demand relating to the 2008 Olympics in Beijing, China. As a result, accounts receivable based

---

[4]    The Complaint suggests that a May 2, 2006 handwritten note requesting a signature and attached to the packet of loan documents demonstrates this backdating.

upon sales to SCHOT/OFE dramatically increased, eventually totaling over two-thirds of SBC's unassigned accounts receivable.[5]  SBC did not insure the SCHOT/OFE accounts receivable as it did its domestic accounts receivable.  In addition, the Plaintiff has alleged that the terms of SBC's business relationships with SCHOT/OFE were extraordinary, including extended payment terms (120 to180 days) and abnormally high resale margins (20% to 50%).

But by late 2007, it became apparent that SCHOT/OFE's resale of the many HD TVs they purchased from SBC had been largely unsuccessful and that SCHOT/OFE were facing liquidity issues.  Thereafter, at Mr. Li's direction, SBC entered into an agreement (the "Royalty Agreement") with SCHOT, wherein OFE was granted an exclusive license to sell Olevia HD TVs in Hong Kong and China, SBC agreed to pay OFE a three-percent royalty on each HD TV sold, and SCHOT provided managerial and collection services for a fee.  Soon thereafter, SBC sales to SCHOT/OFE ceased.

Around the same time and also at Mt. Li's direction, SBC entered into an arrangement with SCHOT/OFE that allowed them to return unsold HD TVs to either SBC or Kolin and receive a credit against their outstanding liability to SBC.  As a result, SBC credited SCHOT/OFE for the return of approximately 25,000 HD TVs, less than half of which were actually returned to SBC's possession.  The Plaintiff has alleged that the remaining HD TVs may have never existed.[6]

---

[5]     It appears that as the SCHOT/OFE accounts receivable grew, the Price Protection Rebates provided by Kolin to SBC decreased.

[6]     The $60 million rebate provided by Kolin to SBC for the related fiscal period (fourth quarter of 2007) appears to compensate for the decreased SCHOT and OFE sales and the effects of SBC's royalty and inventory return agreements with SCHOT and OFE. This quarterly rebate was larger than the cumulative amount of rebates Kolin had provided to SBC in any given fiscal year.

### G.    SBC's Demise

In 2007, SBC's management began assessing alternative financing opportunities to facilitate SBC's continual growth despite the difficult credit market SBC's Asian business partners were facing.  In October 2007, SBC entered into a credit and guaranty agreement (the "Credit Facility") with Silver Point Finance, LLC ("Silver Point"), as administrative agent, and certain lenders.  The Credit Facility provided for a term loan for the principal amount of $150 million and a revolver with a maximum commitment of $100 million.  The Credit Facility required SBC to maintain certain funds on hand to comply with borrowing base requirements.

Due to the decreasing SCHOT/OFE accounts receivable following the return of the HD TVs, SBC was almost immediately in default of the obligations under the Credit Facility, thereby triggering increased interest rates and penalty fees.  The default caused Silver Point to assert control over SBC's cash flow.

Shortly thereafter, Kolin stopped providing SBC with Price Protection Rebates, purported to retract certain rebates, and asserted that it had received no payments on account of certain tooling invoices.  In a further blow to SBC's liquidity, SCHOT and OFE asserted that they owed nothing to SBC and that SBC was in fact indebted to them.  Finally, on July 8, 2008, SBC filed for bankruptcy.

### H.    Plaintiff's Complaint

On July 7, 2010, the Trust commenced this adversary proceeding by filing the Complaint against the Bank.  The Trust has alleged that the Bank contributed to the collapse of the Debtors by providing financing and other banking services that ultimately allowed the Insiders to improperly divert hundreds of millions of dollars in cash to Kolin to the ultimate detriment of the Debtors and their creditors.  By the Complaint, the Trust asserts two theories of liability.  First,

the Trust contends that the Bank knowingly aided and abetted the Insiders in the breach of their

fiduciary duties and their commission of an allegedly fraudulent scheme to funnel hundreds of

millions of dollars from SBC to Kolin.  Second, the Trust asserts that the Bank was a party to a

cluster of actual and constructively fraudulent transfers that the Trust seeks to avoid.  The Bank

filed the Motion seeking to dismiss all of the claims in the Complaint.[7]

This matter has been fully briefed and is ripe for decision.

---

[7]    The Bank has also requested [Adv. Docket No. 17] that the Court take judicial notice of
certain documents referenced in the Complaint, other documents publicly filed with the
Securities and Exchange Commission, and documents appearing on this Court's docket in
support of the Motion pursuant to Federal Rule of Evidence 201, made applicable to these
proceedings by Federal Rule of Bankruptcy Procedure 9017.  The Trust has not objected to this
request.  The documents which the Bank relies upon in this Motion are either integral to the
Complaint and no dispute exists concerning their authenticity, or are matters of public record and
therefore may be considered without converting the Motion to a motion for summary judgment
under Federal Rule of Civil Procedure 12(d).  Faulkner v. Beer, 463 F.3d 130, 133-135 (2d Cir.
2006) (finding that materials external to the complaint may be considered without converting
motion to dismiss to motion for summary judgment if they are "integral" to the complaint and it
is clear on the record that no dispute exists regarding their authenticity or accuracy).  See also
Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007) (finding that contents of documents
appearing on a court's docket are proper subject for judicial notice at the motion to dismiss
stage); Mele v. Fed. Reserve Bank of N.Y., 359 F.3d 251, 256 n. 5 (3d Cir. 2004) (finding that
court may consider documents integral to or explicitly relied upon in the complaint); Oran v.
Stafford, 226 F.3d 275, 289 (3d Cir. 2000) (finding that contents of documents publicly filed
with the Securities and Exchange Commission are proper subject for judicial notice); S. Cross
Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd., 181 F.3d 410, 426-27 (3d Cir.
1999) (finding that court may take judicial notice of public records including judicial proceeding
and dispositions).  Therefore, pursuant to well-established law permitting the Court to take
judicial notice of such documents, the Court will grant the Bank's request and will consider these
documents without converting the Motion to a motion for summary judgment under Federal Rule
of Civil Procedure 12(d).

## II.  JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and

(b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of

this Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (0).[8]

## III.  STANDARD OF REVIEW

The Bank seeks dismissal of the Complaint pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure, made applicable here by Federal Rule of Bankruptcy Procedure 7012,

for "failure to state a claim upon which relief can be granted."  A motion to dismiss for failure to

state a claim upon which relief can be granted is aimed to test the sufficiency of the factual

allegations in the plaintiff's complaint.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) ("A

12(b)(6) motion tests the sufficiency of the allegations contained in the complaint.") (citations

omitted); Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.), 496 F. Supp. 2d

404, 407 (D. Del. 2007), citing Kost, 1 F.3d at 183  ("The purpose of a motion to dismiss is to

test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the

case.").  The chief inquiry with respect to a motion to dismiss is "not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v.

Fitzgerald, 457 U.S. 800 (1982).  The movant carries the burden of demonstrating that dismissal

is appropriate.  Intel Corp., 496 F. Supp. 2d at 408.

---

[8]     The Trust commenced this litigation in this Court and has alleged in ¶ 22 of the
Complaint that this is a core proceeding.  Counts III through VII are fraudulent transfer claims
and are core proceedings under 28 U.S.C. § 157(b)(2)(H).  Counts I and II are state law claims
for aiding and abetting breach of fiduciary duty and fraud, respectively.  To the extent that these
claims are not deemed to be core under 28 U.S.C. § 157(b)(2), the Court has the authority to
issue a final judgment as to such claims by virtue of the Trust's consent and pursuant to 28
U.S.C. § 157(c)(2).

In light of the U.S. Supreme Court's recent decisions in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) and <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009), the Third Circuit Court of Appeals has instructed courts to conduct a two-part analysis when considering a motion to dismiss for failure to state a claim.  <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).  First, the Court should separate the factual elements from the legal elements of a claim and assume the veracity of the factual allegations set forth in the complaint, drawing all reasonable inferences from the facts alleged and construing all allegations in the light most favorable to the plaintiff.  <u>Id.</u>  <u>See also</u> <u>Iqbal</u>, 129 S.Ct. at 1949-50 ("When there are well-pleaded factual allegations, a court should assume their veracity . . . ."); <u>Rea v. Federated Investors</u>, 627 F.3d 937, 940 (3d Cir. 2010) ("We accept all factual allegations as true, construe the Complaint in the light most favorable to Rea, and determine whether, under any reasonable reading of the Complaint, Rea may be entitled to relief.") (citation omitted); <u>Phillips v. Cnty. of Allegheny</u>, 515 F.3d 224, 231 (3d Cir. 2008) ("[O]n a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.").  The credibility of the facts alleged by the plaintiff are not at issue in a motion to dismiss because "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." <u>Twombly</u>, 550 U.S. at 556 (quoting <u>Neitzke v. Williams</u>, 490 U.S. 319, 327 (1989) (internal quotation marks omitted) ("[A] well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'") (quoting <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)).

However, the presumption of truth as to factual allegations does not extend to any conclusory statements of law because the Supreme Court has held that "on a motion to dismiss,

courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"

Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  See also

Iqbal, 129 S.Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions."); Gen. Motors Corp. v. New A.C.

Chevrolet, Inc., 263 F.3d 296, 333 (3d Cir. 2001) ("While facts must be accepted as alleged, this

does not automatically extend to bald assertions, subjective characterizations, or legal

conclusions.") (citations omitted) (internal quotation marks omitted).  The Court may therefore

disregard any legal conclusions in the complaint.  Fowler, 578 F.3d at 210-11.

Second, the Court should determine whether the factual allegations "are sufficient to

show that the plaintiff 'has a plausible claim for relief.'"  Id. at 211 (quoting Iqbal, 129 S.Ct. at

1950) (internal quotation marks omitted).  Federal Rule of Civil Procedure 8(a)(2), made

applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7008(a), requires

that a complaint contain "a short and plain statement of the claim showing that the pleader is

entitled to relief." FED. R. CIV. P. 8(a)(2).  The Supreme Court has stated that the purpose of

Rule 8 is "to give the defendant fair notice of what the . . . claim is and the grounds upon which

it rests." Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957) (internal

quotation marks omitted).  The Supreme Court explained that "[w]ithout some factual allegation

in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not

only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." Id. at

555 n.3.[9]

---

[9]    The Third Circuit has observed that, based upon the Supreme Court's recent decisions in
Twombly and Iqbal, "pleading standards have seemingly shifted from simple notice pleading to a
more heightened form of pleading, requiring a plaintiff to plead more than the possibility of
relief to survive a motion to dismiss." Fowler, 578 F.3d at 210.

The Supreme Court and the Third Circuit both require that a complaint contain more than mere assertions.  Id. at 555 n.3 ("Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."); Fowler, 578 F.3d at 211 ("[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts.") (citations omitted).  Although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 129 S.Ct. at 1950.  Thus "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citation omitted).  Although "legal conclusions can provide the framework of a complaint," Iqbal, 129 S.Ct. at 1950, they nonetheless must be accompanied by facts in support of such conclusions.[10]  In the Third Circuit, "it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss." Fowler, 578 F.3d at 210.[11]

However, the incorporation of only some factual allegations may not suffice at the pleading stage because the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  In accordance with Supreme Court doctrine, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S. Ct. at 1950 (citation omitted).  The Supreme Court's plausibility standard does not require a plaintiff to demonstrate a likelihood of success at trial, but it does require the plaintiff to show

---

[10]    The Third Circuit has cautioned that "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." See also Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 333 (3d Cir. 2001 (internal quotation marks omitted) (quoting 2 James Wm. Moore, Moore's Federal Practice § 12.34[1][b], at 12-61 to 12-63 (3d ed. 2001)).

[11]    To survive a motion to dismiss, "[t]he plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim." Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.), Bankr. No. 03-12656, Adv. No. 08-50248, 2008 WL 4239120, at *4 (Bankr. D. Del. Sept. 16, 2008).

"more than a sheer possibility that a defendant has acted unlawfully." Id. at 1949 (citation omitted). But, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' Iqbal, 129 S. Ct. at 1950 (quoting Rule 8(a)(2)). Considering the merits of a motion to dismiss is necessarily "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense," id. (citation omitted), but where a complaint fails to plead "enough fact to raise a reasonable expectation that discovery will reveal evidence [to support the claim]," Twombly, 550 U.S. at 556, the motion to dismiss must be granted as to such claim.

Where a plaintiff alleges a fraud-based claim, as the Trust here has alleged, such a claim must meet the elevated pleading standard of Federal Rule of Civil Procedure 9(b), made applicable here by Federal Rule of Bankruptcy Procedure 7009, to withstand dismissal. Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). The Third Circuit has explained that the purpose of the requirement in Rule 9(b) that plaintiffs plead with particularity the circumstances of the alleged fraud is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984), cert. denied, 469 U.S. 1211 (1985). It is not a defendant's fraudulent intent that must be pleaded with particularity, but the circumstances constituting the fraud. The Third Circuit has indicated that "allegations of 'date, place or time' fulfill these functions, but

nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegation of fraud." Id.

In bankruptcy proceedings, actual fraudulent transfer claims are among those that must be pleaded with particularity under Rule 9(b). Constructive fraudulent transfer claims are specifically governed by Federal Rule of Civil Procedure 8 rather than by the heightened Rule 9(b) pleading standard. See, e.g., Charys Liquidating Trust v. McMahan Sec. Co. (In re Charys Holding Co.), 443 B.R. 628, 632 n.2 (Bankr. D. Del. 2010); China Resource Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc., 788 F. Supp. 815, 819 (D. Del. 1992); Astropower Liquidating Trust v. Xantrex Tech., Inc., (In re AstroPower Liquidating Trust), 335 B.R. 309, 333 (Bankr. D. Del. 2005). Contra OHC Liquidation Trust v. Nucor Corp.(In re Oakwood Homes Corp.), 325 B.R. 696, 698 (Bankr. D. Del. 2005) ("There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under §§ 544 or 548, whether it is based upon actual or constructive fraud."); Pardo v. Gonzaba (In re APF Co.), 308 B.R. 183, 188 (Bankr. D. Del. 2004). However, this Court has held that "[t]he requirements of Rule 9(b) are relaxed and interpreted liberally where a trustee or a trust formed for the benefit of creditors . . . is asserting the fraudulent transfer claims." Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, 405 B.R. 524, 544 (Bankr. D. Del. 2009). This is because a trustee "inevitabl[y] lack[s] knowledge concerning acts of fraud previously committed against the debtor, a third party." Id. (quoting Schwartz v. Kursman (In re Harry Levin, Inc. t/a Levin's Furniture), 175 B.R. 560, 567-68 (Bankr. E.D. Pa. 1994)).

The Court therefore reviews all of the Plaintiff's claims in the Complaint under the pleading requirements articulated in Rules 8 and 12(b)(6), and Rule 9(b) where applicable.

## IV. DISCUSSION

A.   **Aiding and Abetting Breach of Fiduciary Duty and Fraud (Counts I and II)**

In Count I, the Trust asserts that the Bank knowingly provided substantial assistance to the Insiders in breaching their fiduciary duties. The Trust argues that the Bank's knowledge of the Insiders' misconduct is evidenced by the allegedly "highly irregular" relationship between the Bank and the Insiders, characterized by "special treatment," frequent amendments to Loan Agreement, sloppy documentation involving backdating, and numerous advances of funds made without obtaining customary authorization. Specifically, the Trust alleges that by virtue of its role as lender, the Bank knew that the relationship between SBC and Kolin was "less than arms' length," that Kolin was systematically overcharging SBC for the HD TVs it was importing, and that the Insiders were manipulating the majority of the transactions between SBC and Kolin for Kolin's benefit. The Trust argues that these facts suffice to establish the Bank's knowledge of the Insiders' breach of their fiduciary duties, and that the Bank was complicit in such breach by continuing its lending relationship with SBC.

In Count II, the Trust alleges that by executing a series of circular wire transfers in connection with allegedly fraudulent invoices, the Bank knowingly assisted the Insiders in defrauding SBC and its creditors. Moreover, the Trust asserts that without these transfers, the fraudulent nature of the sales to SCHOT/OFE and the related Kolin invoices would have been revealed because SCHOT/OFE never could have paid SBC. The Trust posits that SBC would have found a different supplier or filed for bankruptcy earlier to prevent further losses. Specifically, the Trust asserts that the Bank facilitated the fraudulent issuance of tooling invoices (the "Tooling Invoices") for plastic molds by processing a series of circular wire transfers. The Tooling Invoices allegedly made it seem as though Kolin had shipped the molds to

16

SCHOT/OFE, causing SBC to attribute millions of dollars of accounts payable owed to Kolin. The Trust argues that by processing wire transfers from SBC to Kolin, from Kolin to SCHOT/OFE, and from SCHOT/OFE back to SBC, the Bank aided the Insiders in covering up their fraud.

The Bank argues that Counts I and II fail as a matter of law. First, the Bank argues that the Plaintiff has failed to assert specific facts necessary to support these claims and that the Complaint fails to plausibly allege that the Bank knew of the Insiders' alleged scheme. The Bank asserts that the terms of all relevant transactions were fully disclosed in all filings (before and after the Merger) and that the allegedly innocent directors, officers, and shareholders (the "Non-Insiders") of the Debtors had full knowledge of such terms. In the absence of any protestation by the Non-Insiders, the Bank argues that it have had no way of knowing that an allegedly fraudulent scheme was afoot. Second, the Bank argues that it is shielded from liability for any wrongdoing by the Insiders under California Financial Code §§ 952 and 953,[12] which the Bank contends absolve it of any duty to police its depositors.

As a threshold matter, the Court considers the applicable California statutes to determine if they operate to shield the Bank from liability for failing to monitor or supervise transfers made into and out of the Debtors' accounts. The first of the relevant statutory provisions, California Financial Code § 952, allows a bank to disregard adverse claims to accounts:

> Notice to any bank of an adverse claim . . . to a deposit standing on its books to the credit of . . . any person shall be disregarded, and the bank, notwithstanding the notice, shall honor the checks, notes, or other instruments requiring payment of money by or for the account of the person to whose credit the account stands . . . without any liability on the part of the bank.

---

[12]    The 2004 Loan Agreement contains a choice of law provision stating that it is governed by California law.

Section 952 requires a bank to comply with judicial orders and if the bank is served with "an affidavit of an adverse claimant," it may delay payment for three days. Chazen v. Centennial Bank, 61 Cal. App. 4th 532, 539 (Cal. App. Ct. 1998). Therefore, a bank is generally not chargeable with knowledge of wrongdoing by authorized signers on a customer's account. In fact, a bank is not chargeable with wrongdoing even in the face of circumstantial evidence of improper account activity:

> [A bank] is required by Financial Code section 952 to disregard notice of adverse claims to the account, including notice conveyed by circumstantial evidence or documents in the bank's possession, unless the claims are made through an appropriate affidavit or court order. Though the bank may be free to terminate the account, it incurs no liability by failing to do so.

Id.

California Financial Code § 953 provides:

> When the depositor of a commercial or savings account has authorized any person to make withdrawals from the account, the bank, in the absence of written notice otherwise, may assume that any check, receipt, or order of withdrawal drawn by such person in the authorized form or manner, including checks drawn to his personal order and withdrawal orders payable to him personally, was drawn for a purpose authorized by the depositor and within the scope of the authority conferred upon such person.

The Chazen court summarized the breadth of section 953:

> [A bank] has no duty to prevent commingling of assets in fiduciary accounts, to monitor fiduciary accounts for irregular transactions, to prevent improper disbursements from the accounts, or to conduct an investigation of possible misappropriation of funds. Instead, the bank is obliged under Financial Code section 953 to honor withdrawals from fiduciary accounts by authorized persons who draw on the account in an authorized manner[.]

Chazen, 61 Cal. App. 4th at 541. Therefore, as long as the persons drawing on the Debtors' accounts are authorized to do so, the Bank has no further duty to inquire.

California courts interpreting these California statutes have consistently declined to impose liability on banks for the wrongdoing of their depositors. See id.; Desert Bermuda Props. v. Union Bank, 265 Cal. App. 2d 146 (Cal. App. Ct. 1968); Boston Ins. Co. v. Wells Fargo Bank, 80 Cal. App. 2d 59 (Cal. App. Ct. 1947). Instead, California courts conform to the principle that "bank[s] [have] no duty to police their fiduciary accounts." Chazen, 61 Cal. App. 4th at 538. Indeed, the relationship upon which bank and depositor is founded "does not involve any implied duty to supervise account activity or to inquire into the purpose for which the funds are being used." Id. at 537 (citations omitted). California courts have found that section 953 "allows a bank to presume that the depositor authorized checks which are drawn by a corporate officer authorized to make withdrawals from the account, even when the officer draws the funds to his personal order." Id. at 538. In other words, "[r]egardless of whatever suspicion might have lurked in the mind of the teller as to the destination of the proceeds, no duty of inquiry [is] cast on the bank." Boston Ins., 80 Cal. App. 2d at 66.

Here, there is no allegation that the Bank received the requisite notice of the allegedly ongoing fraud. Therefore, any assumptions the Bank should or could have made based upon the circumstances surrounding the transfers at issue are immaterial. Moreover, there is no allegation in the Complaint that the Insiders controlling the Debtors' accounts and relationship with the Bank lacked proper authority. This fact, viewed in light of the well-settled principle in California law that banks need not inquire into transactions by corporate officers authorized to make withdrawals, reinforces the Bank's statutory immunity from liability for the actions of the Insiders. Irrespective of the underlying complexity of the transactions at issue here, under California law, the Bank had no statutory or common law duty to police the actions of its depositors.

The Trust argues, without citing any supporting authority, that the California statutes at issue do not apply to banks in their lending capacity, but rather apply only to their role in withdrawals and collections from depository accounts. However, no such distinction is made on the face of the applicable provisions. In fact, case law has clarified that the function of these statutes is to insulate banks from liability once funds are in an account and subject to the account holder's control, regardless of the source of the funds.[13]

In the absence of legal support for the Trust's argument, the plain language of the applicable California statutes and applicable case law leads the Court to conclude that the Bank is shielded from liability for aiding and abetting any alleged wrongdoing by the Insiders. Accordingly, the Court will dismiss Counts I and II of the Complaint.

**B.    Fraudulent Transfers (Counts III through VII)**

By Counts III and V, the Trust alleges that certain transfers are avoidable as actual fraudulent transfers under 11 U.S.C. §§ 544 and 548(a)(1)(A) and relevant Delaware statutes. By Counts IV and VI, the Trust alleges that certain transfers are avoidable as constructively fraudulent transfers under §§ 544 and 548(a)(1)(B) of the Bankruptcy Code and relevant Delaware statutes. Finally, by Count VII, the Trust seeks recovery of avoided transfers pursuant to § 550.

The Trust divides the fraudulent transfers into two main groups. The first group of transactions (the "Debtor Obligations"), referred to in Counts III and IV, consists of the transfers that relate to the obligations the Insiders caused the Debtors to incur to siphon money to Kolin as

---

[13]    Additionally, the Bank correctly states that the alleged damage to the Debtors occurred as a result of the Debtors' disbursal of loan proceeds out of the Debtors' accounts. The Bank's actions in documenting and making the loans and disbursing proceeds into the Debtors accounts did not harm the Debtors because the damage here flowed from the Debtors' own disbursal of funds to Kolin.

part of their alleged scheme to "prop up" Kolin and defraud the Debtors in connection with the Kolin Line. The Trust argues that the two conceptual "legs" of the Debtor Obligations, the transfer of money from the Bank to the Debtors and the disbursal of proceeds from the Debtors to Kolin, must be collapsed into one integrated transaction for purposes of any fraudulent transfer analysis because the Bank had actual or constructive knowledge of the Insiders' scheme. The Trust asserts that once the transfers in question are collapsed and viewed as one integrated transaction, the Debtor Obligations are avoidable. The Trust argues that it can avoid the Debtor Obligations in Count III under a theory of actual fraud because it has pleaded several badges of fraud. Namely, the Trust alleges (1) the lack of an arms-length relationship between the Insiders and Kolin; (2) the fact that the Debtors did not receive reasonably equivalent value in exchange for any of the transfers to Kolin; (3) insolvency; and (4) concealment of the wrongful transfers through a "massive accounting fraud." The Trust asserts that it can also avoid these obligations in Count IV under a theory of constructive fraud based on the sufficiency of its pleadings that the Debtors received less than reasonably equivalent value for the Debtor Obligations and that the Debtors were insolvent.

The second group of transactions (the "Principal and Interest Transfers"), referred to in Counts V and VI, consists of the payment of principal and interest the Debtors undertook in connection with the Debtor Obligations, which the Trust alleges were never legally enforceable obligations. To assert these claims, the Plaintiff also relies upon the collapsing argument noted above. Under a theory of actual fraud, the Trust posits that it can avoid the Principal and Interest Transfers in Count V based on allegations of the presence of two badges of fraud. First, as the Trust alleges that each of the principal and interest transfers were made pursuant to an underlying obligation that was allegedly invalid and legally unenforceable, the Trust argues that

the Debtors did not receive reasonably equivalent value in exchange for making the principal and interest transfers. The Trust contends that it can also avoid these transfers were made at a time when the Debtors were insolvent.

The Bank contends that the allegedly transfers cannot be collapsed and viewed as one integrated transaction because the Bank never had actual or constructive knowledge of the Insiders' scheme. The Bank also argues that the Plaintiff's actual fraudulent transfer claims must fail because the Complaint does not contain any allegations that the Debtors intended to defraud SBC and its creditors when they incurred the loan obligations to the Bank. The Bank further argues the Debtors received reasonably equivalent value in exchange for the obligations they incurred, in the form of credit that the Bank extended to SBC and the loan proceeds which it disbursed to SBC at its request, such that the Trust's constructively fraudulent transfer claims necessarily fail.

Given that the Plaintiff's fraudulent transfer claims all rely upon a finding that collapsing the allegedly transactions is warranted, the Court addresses this threshold issue first. The leading authority in the Third Circuit on the propriety of collapsing multiple individual transactions when determining whether a transaction constitutes a fraudulent transfer is United States v. Tabor Court Realty Corporation, 803 F.2d 1288, 1302 (3d Cir. 1986). The court in Tabor held that when a series of transactions are "part of one integrated transaction," courts may look "beyond the exchange of funds" and "collapse" the individual transactions of a leveraged buyout. Id. Instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions have on the creditors. Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 497-498 (Bankr. D. Del. 2010); Liquidation Trust of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group (In re Hechinger Inv.

Co.), 327 B.R. 537, 546–47 (D. Del. 2005). To make this determination, courts have considered three factors in their analysis: (1) whether all of the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own; and (3) whether each transaction was dependent or conditioned on other transactions. Id.

The classic context for collapsing multiple transactions to impose liability for fraudulent transfer occurs when a debtor seeks to unwind a leveraged buyout ("LBO"). See Tabor, 803 F.2d at 1302. A court considers the two steps in the transaction to determine if the second step in the transaction either results in the debtor receiving less than fair consideration or results in an intentionally fraudulent transfer of the proceeds of the first step. If so, the court must assess whether the party to the first step had actual or constructive knowledge of the facts rendering the second step fraudulent. HBE Leasing Corp. v. Frank, 48 F.3d 623, 635-36 (2d Cir. 1995) ("[T]he courts have looked frequently to the knowledge of the defendants of the structure of the entire transaction and to whether its components were part of a single scheme."); see also Mervyn's, 426 B.R. at 497-98 (finding sufficient facts to show that defendant had knowledge of each of the transactions, including the subsequent parts of the transaction, which left the debtor stripped of assets and overburdened with debt it could not hope to pay); Liquidation Trust of Hechinger, 327 B.R. at 546-47 (finding that defendants had knowledge of the consequences of subsequent steps in the transaction); Tabor, 803 F.2d at 1302-03 (party to first step in transaction had knowledge of the financial consequences of the subsequent steps). Notice is central to each of the LBO cases above, because the courts in those cases determined that the party providing the funds for the LBO was well aware that the proceeds of the loan would be paid to former shareholders of the debtor while the debtor's assets were pledged to secure its loan obligation.

Here, the Complaint, read in light of the audited financial statements, public filings, and the representations and warranties of the loan documents, and read in the light most favorable to the Plaintiff, alleges no plausible set of facts under which the Bank actually or constructively knew of the allegedly fraudulent nature of the Kolin pricing and rebate scheme, the Tooling Invoices, or the SCHOT/OFE invoices.  Moreover, the Complaint fails to plausibly allege facts or otherwise indicate what a reasonable inquiry would have shown or even what inquiries the Bank should have made.  Because the Complaint fails to adequately allege that the Bank knew or should have known of the allegedly wrongful purpose of the many transactions outlined above, the Court finds that the series of transactions at issue cannot be collapsed into one transaction. See Tabor, F.2d at 1303 (knowledge of participant is essential to collapsing transfers for purposes of imposing liability on a fraudulent transfer claim).  Because Counts III through VII are predicated upon the Plaintiff's collapsing argument, the Court finds that each of the fraudulent transfer claims necessarily fail.[14]  Accordingly, the Court finds that dismissal of these counts is appropriate and will therefore dismiss the Complaint in its entirety.

---

[14]    Beyond the lack of credible allegations of actual knowledge, which is fatal to claims based upon actual fraud, the Court also notes that the constructive fraudulent transfer claims would also fail on the ground that the record demonstrates that reasonably equivalent value was received (in the form of loan proceeds) by the Debtors in connection with the various transactions.

24

## V. CONCLUSION

For the foregoing reasons, the Court finds that the Complaint fails to state a claim upon which relief can be granted. Therefore, all counts in the Complaint must be dismissed. An appropriate Order follows.

BY THE COURT:

Dated:    Wilmington, Delaware
July 25, 2011

Brendan Linehan Shannon
United States Bankruptcy Judge